```
 1                 UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3    UNITED STATES OF AMERICA,       Docket No. 3:16CR166

 4              Plaintiffs,           Toledo, Ohio

 5              v.                    March 8, 2018

 6    PABLO DURAN RAMIREZ,

 7              Defendant.

 8    ------------------------------

 9                TRANSCRIPT OF DETENTION HEARING
                BEFORE THE HONORABLE JAMES G. CARR
10                UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the Plaintiffs:  Chelsea S. Rice
                           Office of the U.S. Attorney
14                         801 Superior Avenue, W, Suite 400
                           Cleveland, Ohio 44113
15                         (216) 622-3752

16                         Dana Mulhauser
                           U.S. Department of Justice
17                         950 Pennsylvania Avenue
                           Washington, DC 20530
18                         (202) 305-0007

19

20    For the Defendant:
                           David H. Thomas
21                         Taft, Stettinius & Hollister
                           65 East State Street, Suite 1000
22              Columbus, Ohio 43215
                           (614) 334-6199
23
      Court Reporter:      Angela D. Nixon, RMR, CRR
24                         1716 Spielbusch Avenue
                           Toledo, Ohio 43624
25                         (419) 260-5259
```

1   Proceedings recorded by mechanical stenography, transcript

2   produced by notereading.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          COURTROOM DEPUTY:  3:16CR166, United States of

 2  America versus Pablo Duran Ramirez.  Matter called for

 3  detention hearing.

 4          THE COURT:  Counsel, will you please identify

 5  yourself for the record and the folks who are with you at

 6  counsel table?  For the government?

 7          MS. RICE:  Good afternoon, Your Honor, Chelsea

 8  Rice, Assistant United States Attorney.  I am joined with

 9  my co-counsel, Dana Mulhauser, trial attorney from

10  Department of Justice, and Special Agent Matthew Komar with

11  the FBI.

12          THE COURT:  And for the defendant, Mr. Duran?

13          MR. THOMAS:  Your Honor, thank you.  Please The

14  Court, Dave Thomas on behalf of Mr. Pablo Duran Ramirez to

15  my left.  To my far left is the certified interpreter.

16          THE COURT:  And your name again, counsel?

17          MR. THOMAS:  Your Honor, Dave Thomas on behalf of

18  Mr. --

19          THE COURT:  Oh, Mr. Thomas.  Thank you.  You may

20  be seated.  And Ms. Donahue has already been previously

21  sworn as interpreter.  Ms. Donahue, you know what I'm going

22  to say next.  Please tell your client if I speak too

23  quickly or he has any questions, for him please to say so.

24          Matter comes on for purposes of detention or

25  release pending further proceedings in this case.  And on

1    behalf of the defendant?

2              MR. THOMAS:  Your Honor, thank you.  If it please

3    The Court, this is, we believe, a rebuttable presumption

4    case, so we are prepared to present witness testimony in

5    support of this.

6              THE COURT:  Okay.  Go -- you're more than

7    welcome.  I apologize for being late.  I came within a hair

8    breath of settling a case and people got too stubborn too

9    late, and all my persuasive efforts are -- went to not.

10   But, anyway, such is life.  But that's what I was doing, I

11   was still working with them.  I thought I would be done by

12   noon and I wasn't.  Such is life.

13             Okay.  You may proceed.  And, Jordan, why don't

14   you come over here.

15             MR. THOMAS:  Your Honor, we have a witness

16   outside the courtroom.  May I bring him in?

17             THE COURT:  Of course.  I'm not going to go out

18   in the hall.  Actually, before we begin, sir, you may be

19   seated if you wish.

20             COURTROOM DEPUTY:  Do you want me to swear him in

21   first?

22             THE COURT:  No.  He can sit in the jury box if he

23   wants, whatever works for him.  Why don't you refresh for

24   me and outline for the defendant, you know, the --

25   basically the bare bones narrative account of the evidence

1    as you understand it, what you think the government's

2    evidence will show if the case goes to trial.  I do have

3    some recollection, of course, from having him -- I think

4    this is the same case that involved three other defendants;

5    is that correct?

6            MS. RICE:  Your Honor, there were six other

7    individuals.

8            THE COURT:  Pardon me?

9            MS. RICE:  Six other defendants who have been

10   convicted in connection with this same --

11           THE COURT:  You can remain seated.  I'm having

12   real trouble hearing you.  This -- The Court -- the

13   acoustics in this courtroom have been abysmal since

14   whatever -- whenever it was in 1934 when it first opened

15   its doors.  We have tried numerous times, spent tens of

16   thousands of dollars on equipment, and here we are.  So go

17   ahead.

18           MS. RICE:  All right.  Thank you, Your Honor.

19   There have been six other defendants who have pled guilty

20   in connection with this harboring and trafficking

21   conspiracy.  And the defendant here today, Pablo Duran

22   Ramirez, is charged by way of separate indictment with

23   harboring and a forced labor conspiracy, and is outlined in

24   two counts.  I can -- or excuse me, three counts.  I can

25   speak to, in general detail, I'm not quite clear what Your

 1  Honor would like the government to proceed with at this

 2  time.

 3          THE COURT:  Why don't you just tell me, in very

 4  short narrative form, what you believe your evidence, you

 5  know, to a substantial degree of certainty, the evidence

 6  that you expect would be admitted at trial would be likely

 7  to show about his overall role in the activities involving

 8  the other five defendants of whom three I recall pretty

 9  well, the principle recruiter, his young female assistant

10  who, as I understood and recall from the sentencing

11  proceeding, basically acted as the overall overseer of the

12  young people who had been smuggled into this country by the

13  principle defendant.  And then there was a less culpable

14  defendant who, if memory serves, and if I'm thinking of the

15  same scenario, and if I'm not say so, was the son of this

16  gentleman.  And that basically the overall conspiracy

17  involved diluting families of young men, age -- ranging in

18  age I think from 14 to 20 or 21 from a small village in

19  Guatemala back in the hills and high lands somewhere,

20  diluted them.  The principle person responsible diluted the

21  parents into believing that if they gave him deeds to their

22  houses to secure a fee of 3 to $5,000, he would get them

23  into the United States, enroll them in United States

24  schools, they would get an American education.  And at the

25  end of the day they would become American citizens.

1    Instead, at least some of them were placed in conditions

2    that I referred to as calling to mind, in effect, an

3    American gulag, an unheated trailer with no real sanitary

4    facilities and vermin infested, somewhere outside Marion,

5    Ohio.  Some of these children were as young as 14 years

6    old.  There were three of them that came to court and gave

7    victim impact statements.  For that, I was apprized that

8    this defendant had not been located.

9         I also learned, preparatory to sentencing, that

10   the principal defendant had taken these deeds, also that

11   during the course of their servitude, the young men had not

12   received their paychecks for -- at least not their full and

13   complete paychecks, that the conditions in which they were

14   required to work as part of the crew, doing literally the

15   dirty work of the egg farm, were, to say the least,

16   unpleasant, pecked and scratched and so forth, as well as

17   simply working in a chicken barn or whatever you call it.

18   And that the principal person responsible, who apparently

19   was related to some of the young people whom he smuggled

20   into the United States was related to some of them.

21        But in any event, I learned about the business of

22   his having taken the deeds from their families.  I made

23   very clear -- I think I sort of interrupted and continued

24   that sentencing, making very clear to him and his lawyer

25   that unless I were to receive notice at the next sentencing

1    hearing that every one of those deeds had been restored to

2    the families of the children whose circumstances he was

3    directly responsible, my only question at sentencing would

4    be how many counts, what's the maximum as to each count,

5    and can I run them consecutively.  We paid his lawyer,

6    Mr. David Klucas, I think some -- I don't know how much, I

7    would imagine upward of $10,000 or more.  We also paid a

8    Guatemalan lawyer.  Mr. Klucas went, at my express

9    direction, to the small village in Guatemala and undertook,

10   through the Guatemalan lawyer, who was extremely helpful,

11   to gain such assurance as we could that indeed the ring

12   leader upon release from -- I think gave him a 15-year term

13   at the end of the day -- could not profit from his vile

14   endeavors.  If that's -- if that is not that case, correct

15   me -- or part of that case.

16        MS. RICE:  You are speaking of the same case,

17   Your Honor.

18        THE COURT:  And if I've missed anything of

19   substance in my oftentimes faulty recollection, by all

20   means correct me.

21        MS. RICE:  No, you accurately recited the brief

22   history of the case.  And I would only now --

23        THE COURT:  If you remind me, call to mind what

24   you allege this defendant's role to have been.  I believe

25   he was the actual person who negotiated with the egg farms

1   and was the crew boss.  And by all means, if that's wrong,

2   say so.

3           MS. RICE:  That's correct, Your Honor.  This

4   defendant owned a company called Haba Corporate Services

5   that contracted directly with the egg farm to employee

6   individuals to work at various locations of the egg farms.

7   Under his direction, he had various subcontractors who he

8   spoke with about obtaining workers.  And on at least six

9   occasions, he had conversations with Aroldo

10  Castillo-Serrano, the individual who was convicted of

11  trafficking.

12          THE COURT:  The principal ring leader of that

13  side of it?

14          MS. RICE:  Of the trafficking side, correct, Your

15  Honor.

16          THE COURT:  He provided -- Serrano provided and

17  he employed, as it were, the children; is that correct?

18          MS. RICE:  That's correct, Your Honor.  And if we

19  were to proceed to trial, we would present evidence that

20  this individual, this defendant, had conversations in which

21  he knew that, one, these individuals would be minors that

22  would be working for him; and that, two, they would be

23  coming to the United States illegally from Guatemala.

24          In addition, there is separate evidence and

25  testimony that this defendant, Duran Ramirez, knew of the

1    illegal status of not only the minors, but other

2    individuals that worked for his company and the

3    subcontracting companies, and that he and his company

4    benefited greatly as a result of employing these illegal

5    immigrants -- not immigrants, but individuals that were

6    brought here illegally.

7              THE COURT:  You say profited greatly, is your --

8    the basis for that representation grounded in evidence that

9    you have a fair reason to believe would be admissible

10   either at trial or at sentencing?

11             MS. RICE:  Yes, Your Honor.  That is based upon

12   various financial records that we have obtained, tax

13   records.  And this would be evidence that would be

14   presented at trial and/or sentencing.

15             THE COURT:  And how great was the profit that he

16   generated for himself and others, if any, approximately?

17   Be conservative.

18             MS. RICE:  One moment, Your Honor, let me check.

19             THE COURT:  Of course.  And if you can't say now

20   that doesn't really matter, I'm just curious.

21             MS. RICE:  I just don't want to give the wrong

22   figure.

23             THE COURT:  Of course not.

24             MS. RICE:  Your Honor, we believe the evidence

25   would set forth that his company Haba Corporate Services

1  took in just over $6 million during a two year time period.

2  They paid its contractors just over three-and-a-half

3  million, which left his company a profit of two-and-a-half

4  million dollars during that two year time period.

5          THE COURT:  You refer to company.  Was it a

6  Corporation or LLC?  And if so, do you know anything about

7  the members of -- the size and nature of the corporation?

8  Was it a sole proprietorship, or were there multiple

9  investors, if you know?  If not, that's fine.

10          MS. RICE:  Your Honor, it was a corporation for

11  profit.  That was this defendant, Pablo Duran Ramirez, and

12  his brother Ezekial Duran.

13          THE COURT:  Is his brother a co-defendant?

14          MS. RICE:  His brother is not a co-defendant.

15  His brother is deceased.

16          THE COURT:  Okay.  Anything further you wish to

17  add with regard to what you represent to me as an officer

18  of The Court that you believe would be admissible evidence

19  to show at trial and perhaps at sentencing?

20          MS. RICE:  The last thing I would add, Your

21  Honor, with respect to the forced labor conspiracy, which

22  is Count 1 of the indictment for this defendant, is that in

23  addition to having conversations with co-conspirators about

24  bringing in minors and individuals who were illegally in

25  the United States, we have evidence that would be presented

 1   at trial that this defendant paid money to facilitate the

 2   release of these minors at the border to come work for him

 3   and --

 4           THE COURT:  Paid money on which side of the

 5   border, our side?

 6           MS. RICE:  On the United States side of the

 7   border.

 8           THE COURT:  Would that be paid some gratuities or

 9   consideration to American law enforcement or other

10   officials, customs, border, whatever it was?

11           MS. RICE:  To his other co-conspirators,

12   specifically Ana Angelica Pedro Juan.

13           THE COURT:  Pardon me?

14           MS. RICE:  To his co-conspirators, specifically

15   the defendant Ana Angelica Pedro Juan.

16           THE COURT:  Okay.  Have you undertaken to do

17   an -- what's the maximum penalty upon conviction?

18           MS. RICE:  Twenty years, Your Honor.

19           THE COURT:  And there are three counts.  Is that

20   as to each count or --

21           MS. RICE:  That is to the -- well, that is to

22   Counts 1 and 2, forced labor conspiracy and a substantive

23   forced labor offense.  The third count is a harboring

24   offense, and that is a maximum term of ten years

25   imprisonment, Your Honor.

1          THE COURT:  Does the amount generated from this

2    factor into the relevant conduct consideration or not, if

3    you know?  If not, that's fine.

4          MS. RICE:  The profits generated?

5          THE COURT:  Yes.

6          MS. RICE:  We certainly believe that plays into

7    the relevant conduct, but it does not affect the sentencing

8    guidelines.

9          THE COURT:  It's not a specific enhancement

10   factor, the way of drug quantity or amount of the fraud or

11   whatever would be --

12         MS. RICE:  No, Your Honor.

13         THE COURT:  -- or the amount of loss in certain

14   circumstances.  Okay.  Okay.  And how would you

15   characterize the weight of the evidence as you understand

16   it, and as it is believed by you -- reasonably believed by

17   you to be available to you and likely to be available at

18   trial and the likelihood of conviction, on a scale of --

19   we'll give it a try to -- we're going to play the ten to

20   the ace of spades to be a royal flush.  And no lawyer ever

21   says that I know.

22         MS. RICE:  Your Honor, I will say United States

23   is very confident in its evidence and its witnesses and

24   believes that we would obtain conviction on all three

25   counts against this defendant.

1          THE COURT:  Do you have any idea about a criminal

2   history?

3          MS. RICE:  It's our understanding he has limited

4   criminal history if any at all.

5          THE COURT:  Probably a one?

6          MS. RICE:  Correct, Your Honor.

7          THE COURT:  Okay.  Do you have an idea if he were

8   a one what the guideline range might be?

9          MS. RICE:  Your Honor, based on our preliminary

10  calculations, the offense level would be a 31 before

11  acceptance, which would result in a guideline range.

12         THE COURT:  Before or with --

13         MS. RICE:  Without acceptance.

14         THE COURT:  Okay.

15         MS. RICE:  Guideline range of 108 to 135 months.

16         THE COURT:  Okay.  Okay.  Counsel, do you wish to

17  say anything about the government's presentation with

18  regard to the nature and substantiality of the apparent

19  evidence knowing that that's all it is, it's a

20  representation?  And there can be a slip between cup and

21  lip between now and trial, I understand that.  Do you have

22  anything you wish to add to that?  If not, that's fine.

23  You obviously have no burden to do so.  You have absolute

24  right to say nothing in that regard.  I just wondered if

25  there's anything you did want to add, and I offer -- and I

1    want to emphasize I do not expect it.  And obviously the

2    fact that you do not has nothing to do with anything.  This

3    is an opportunity if you wish.  And if not, that's fine.

4           MR. THOMAS:  I'd like to offer just a couple

5    comments if it please The Court.

6           THE COURT:  Yeah.

7           MR. THOMAS:  So we have had an initial

8    preliminary discovery meeting with the government, so that

9    process has begun, but I had not reviewed the discovery.

10   So with that caveat in mind, I would offer a couple of

11   observations with respect to the government's comments.

12   And these are relevant factors under 1342 of course.

13          The first is as to the nature and circumstances

14   of the offense.  It is a conspiracy, and so the -- the

15   particular role that my client did or did not play in this

16   conspiracy is, I suspect, going to come down to some very

17   fine distinctions, and perhaps just a few conversations

18   with co-conspirators.  So I think that we look forward to

19   further exploration of that.  And I think perhaps that

20   under minds a little bit the weight of the evidence as it's

21   portrayed by the government.  That's not to diminish the

22   seriousness of this overall case.  I'm aware of the history

23   as well, Your Honor.  But I would urge The Court to look at

24   that in kind of a mitigating way as it weighs the 1342

25   factors as it relates specifically to my client.  So that's

1    the first 1342(g) factors.  We are prepared to proceed with

2    respect to information about his history and character.

3    Would you like me to do that, Your Honor?

4              THE COURT:  Sure.  Go ahead.

5              MR. THOMAS:  Your Honor, we call John Glessner to

6    the stand.

7                         JOHN GLESSNER,

8    was herein, called as if upon examination, was first duly

9    sworn, as hereinafter certified, and said as follows:

10             THE COURT:  Sir, you may be seated.  You've got

11   to move up to the microphone to about this distance, and I

12   realize it's a little --

13   A.        Okay.

14             THE COURT:  -- awkward doing so.  Tell me your

15   name, please.

16   A.        John William Glessner, Jr.

17             THE COURT:  And what is your community of

18   residence, what town, city, village?

19   A.        Mesa, Arizona.

20             THE COURT:  Are you employed?

21   A.        I'm self-employed.

22             THE COURT:  And what's your occupation.

23   A.        In the egg business.

24             THE COURT:  Pardon me?

25   A.        Egg business.

1          THE COURT:  Okay.  And what is your understanding

2    why you're here?

3    A.        Well, Pablo Duran basically directly worked for

4    me for about 20 years.

5          THE COURT:  Okay.  And were I to decide to

6    release him pending trial -- let me ask you this.

7          First of all, you heard what the government had

8    to say?

9    A.        Yes.

10          THE COURT:  And let's assume for the moment,

11   without pre-judging, but let's assume for the moment that

12   the likelihood of conviction is very substantial, and that

13   the guideline sentence is something which I have to take

14   into consideration, that he faces a sentence somewhere

15   south of ten years, ten years or some more, give or take a

16   bit.  Are you aware of that?

17   A.        Yes.

18          THE COURT:  Okay.  And being aware of that, you

19   are willing to offer him employment pending --

20   A.        Yes.

21          THE COURT:  -- outcome, whatever it may be?

22   A.        Yes.

23          THE COURT:  Good, bad or otherwise -- I'm not

24   sure there's an otherwise.  And how come?

25   A.        Well, like I said, he worked for me for about 20

1   years.  We had a lot of different agencies, both federal

2   and state come in, and we never had any issues with Pablo.

3   I'm not aware of any prior criminal history at all, so I'd

4   like to help him out.

5          THE COURT:  And where would he be working?

6   A.     Alden, Iowa.

7          THE COURT:  In Iowa?

8   A.     Yes.

9          THE COURT:  And where is that?

10  A.     About the middle of the state of Iowa.

11         THE COURT:  Okay.  And what kind of operation do

12  you have there?  What would be his capacity?

13  A.     It's an Egg Land facility I took back from lease.

14  It's going to be remodeled here starting in another month.

15  We started some in the -- in the fall until weather hit,

16  and then eventually would be put back on -- online with

17  chickens and that.

18         THE COURT:  Okay.  And what sort of work would he

19  be doing?

20  A.     He would be overseeing some of the construction

21  to start out with, and then overseeing production.

22         THE COURT:  And tell me more.  What does that

23  involve?

24  A.     Oh, boy.  Overseeing the contractors, overseeing,

25  you know, the construction, the --

```
 1              THE COURT:  Overseeing contractors, contractors

 2     who do what, provide --

 3     A.        Construction.

 4              THE COURT:  Do the construction, okay.  And then

 5     once that phase is over and the facility's in the business

 6     of producing what you want it to produce, namely eggs for

 7     us, what would he be doing day in and day out?

 8     A.        Overseeing the egg production.

 9              THE COURT:  What does that involve?

10     A.        The chickens, everything from feeding programs,

11     water programs, light programs.

12              THE COURT:  Would he do that work himself, or

13     would there be others subordinate to him who he would

14     oversee, manage, direct and control?

15     A.        Yeah, there would be supervisors underneath him.

16              THE COURT:  Okay.  And about how many people --

17     the activities, about how many people would he be

18     responsible?

19     A.        Fifty.

20              THE COURT:  Okay.  What kind of experience have

21     you had with him in the 20 years he worked for you in the

22     past, in him doing the sorts of things you would expect him

23     to do now?

24     A.        Excellent.

25              THE COURT:  And how much would he be making per
```

1  hour, per week, per month?

2  A.        We've got to negotiate that.  I'm going to guess

3  somewhere between 2,000 a week, I'm guessing.

4          THE COURT:  And to what extent would he be

5  responsible for seeing to it that the people actually doing

6  the work, whether supervisors or their subordinates, were

7  actually paid?

8  A.        Well, we --

9          THE COURT:  Did he have any role in that at all?

10  A.        No.  Office staff there at site would take care

11  of that.

12          THE COURT:  Okay.  So he'd be, if I characterize

13  his activities, sort of general manager?

14  A.        Yes.

15          THE COURT:  Like a plant manager is in -- in a

16  manufacturing facility, very rough crew?

17  A.        Yes, somewhat similar.

18          THE COURT:  Somewhat.  Okay.

19          Counsel, free to ask further -- by all means,

20  defense counsel, and I'll -- if you have further questions

21  you want to ask him on direct, and then I'll have the

22  government ask such questions as she may want to ask.

23                      DIRECT EXAMINATION

24          MR. THOMAS:  Thank you, Your Honor.

25  BY MR. THOMAS:

1    Q.        Mr. Glessner, The Court very thoroughly covered

2    Mr. Duran's potential employment, but I'd like to ask you

3    some questions about his residence.

4    A.        Yes.

5    Q.        Is he also able to secure a place of residence if

6    he comes to work for you if Judge Carr releases him?

7    A.        Yes.  I have an on-site house there, living

8    house.

9    Q.        Okay.  Is that something that's basically

10   supplied by your company for the general manager and his

11   family?

12   A.        Yeah, because livestock, it's, you know, alarms

13   and everything else and weather, so he has to be on call 24

14   hours a day.

15   Q.        Is that at an address 13998 140th Street in

16   Alden, Iowa; is that correct?

17   A.        Yes.

18   Q.        And are you familiar with Mr. Duran's family as

19   well?

20   A.        Pardon me?

21   Q.        Are you familiar with his family as well?

22   A.        Yes.

23   Q.        Is that through your history with him and his

24   employment?  In other words, is that how you got to know

25   them?

1   A.        Yes, and recently.  I never met his two younger

2   kids until recently.

3   Q.        Does Mr. Duran have family in and around the

4   Alden, Iowa area?

5   A.        Yes.

6   Q.        Would you characterize it as basically he has

7   strong family ties in that area because his family works in

8   the -- in and around the egg industry?

9   A.        Yes.  His mother, brother, that are 30-miles away

10  and also his wife and two kids and her family, or about the

11  same.

12  Q.        And they all work, they all live there.  Do you

13  have any concerns about any of their -- are they productive

14  members of the community in that area?

15  A.        Yes.

16          MR. THOMAS:  May I have a moment, Your Honor?

17          THE COURT:  Of course.

18              (Mr. Thomas conferring with defendant off

19               the record.)

20          MR. THOMAS:  That concludes my questions.  Thank

21  you, Your Honor.

22          THE COURT:  Counsel, any questions?

23                      CROSS-EXAMINATION

24  BY MS. RICE:

25  Q.        Thank you, Your Honor.

```
 1                 Good afternoon, Mr. Glassman.

 2    A.          Good afternoon.

 3    Q.          I'd like to know when you first began discussing

 4    this employment with Mr. Duran Ramirez.

 5    A.          Well, I tried to get ahold of him through part of

 6    his family because he was in Mexico, and then I was down

 7    there twice and discussed it with him.

 8    Q.          Did you have a difficult time reaching him

 9    through his family?

10    A.          Not at all.

11    Q.          Why did you travel down to Mexico to see him?

12    A.          Because I was talking to one of his brothers

13    about avocados in Mexico.

14    Q.          Did he discuss with you the fact that he might be

15    facing criminal charges if he came to the United States?

16    A.          No, I brought it up to him.

17    Q.          Was he -- did he seem to be aware of the fact

18    that he might be facing criminal charges if he came to the

19    United States?

20    A.          Not at all.

21    Q.          After you -- what made you think that he might be

22    facing criminal charges if he came to the United States?

23    A.          I was con -- my ex-wife was contacted by a

24    reporter out of, I think it's U.C. Berkley, and then I met

25    with her.  She interviewed me, and then brought up -- and
```

1    then she said I don't know if there's charges, I guess she

2    talked to your department or whatever.  And then I talked

3    to him about it.

4    Q.        Around when was this?

5    A.        Good question.

6              THE COURT:  Best estimate.  What was the weather

7    like outside?

8    A.        Early fall.  I was in California early fall.

9    Q.        Early fall of 2017?

10   A.        Yes.

11   Q.        And why did it take from early fall of 2017 to --

12   if you know, for Mr. Duran Ramirez to come back to the

13   United States?

14   A.        I guess at some point he was talking to his

15   attorney about it, and trying to arrange something.

16   Q.        Are you aware of whether Mr. Duran Ramirez came

17   back to the United States using an official border

18   crossing?

19   A.        Yes, I'm aware, and no, I don't believe so.

20   Q.        Did Mr. Duran Ramirez explain to you why he came

21   to the United States not at a regular border crossing but

22   by trying to cross impermissibly?

23   A.        I talked to him prior to Christmas before -- I

24   haven't talked to him or seen him until today until prior

25   to Christmas.  But what he was trying to do was get his

1  family situated in Iowa, and what -- he wanted to go there

2  for two days, and then he was going to go to Ohio and turn

3  himself in.  Now, how all that worked, I don't know.  I

4  know that his attorney was working, I think with you or the

5  department.

6  Q.      So he told you in advance that he was intending

7  to enter the United States through an official border

8  crossing?

9  A.      Not at all.

10 Q.      No, he didn't tell you that before --

11 A.      No.

12 Q.      -- he came in?

13 A.      No.  All that we discussed was his preference of

14 coming to the United States was to go to Iowa for two days,

15 get his family situated, then come turn himself in in Ohio.

16 Q.      Did you discuss with him whether or not to come

17 in in an official way or in an impermissible way?

18 A.      Absolutely not.

19 Q.      I want to ask you about a man named Jack

20 DeCoster.  Are you familiar with Jack DeCoster?

21 A.      Very much so.

22 Q.      Who is Jack DeCoster?

23 A.      He's a retired egg producer.

24 Q.      Did you work for Jack DeCoster?

25 A.      I was a consultant.

```
 1              THE COURT:  How do you spell that man's --
 2              MS. RICE:  Last name DeCoster D-E, capital
 3    C-O-S-T-E-R.  Did I get that right, Mr --
 4    A.       Yes.  First name's Austin, and middle's Jack.
 5              THE COURT:  First name is --
 6    A.       Austin.
 7    Q.       And Mr. DeCoster runs a number of -- or owns or
 8    runs a number of egg farms in Iowa; is that correct?
 9    A.       Used to.
10    Q.       Are you aware that Mr. Duran Ramirez worked for
11    Jack DeCoster for over 20 years?
12    A.       No, he didn't.
13    Q.       No he did not?
14    A.       No, he worked for my company.
15    Q.       As somebody who worked for your company, did he
16    work at Mr. DeCoster's egg farms?
17    A.       Yes.
18    Q.       So are you aware that he worked at Mr. DeCoster's
19    egg farms for over 20 years?
20    A.       No, it would be less than that.
21              THE COURT:  He was there for awhile?  What --
22    what went on -- what was the relationship between him and
23    Mr. DeCoster?
24    A.       What the -- what the relationship was was this,
25    originally Pablo came I think down to Missouri.  I was
```

1    managing some egg operations to an unrelated company, not

2    related to DeCoster.  Then I brought him up to Alden, Iowa,

3    which I own.  And then eventually he did work at the

4    DeCoster facilities.

5    Q.        Are you aware that Mr. Duran Ramirez was working

6    for Mr. DeCoster in 2003 when Mr. DeCoster pleaded guilty

7    to the federal offense of knowingly hiring more than

8    100 illegal aliens?

9    A.        I don't believe that to be true.

10             MR. THOMAS:  I'm going to object to the

11   relevance.

12             THE COURT:  Which part?  Which part of that

13   question --

14   A.        I don't believe that he knowingly agreed that he

15   hired 100 illegals.

16   Q.        Okay.  Were you aware that Mr. Duran Ramirez was

17   working at a Jack DeCoster's facility when Jack DeCoster

18   pleaded guilty to harboring some amount of illegal aliens

19   at that egg farm?

20   A.        Yeah, I think it was one, and I pled to I think

21   two people.

22   Q.        So you also pled guilty to harboring -- two

23   counts; is that right?

24   A.        I'm not 100 percent sure, but it's close to that.

25   Q.        Okay.

```
1              THE COURT:  When was that?

2    A.        2000 -- the original I-News investigation had

3    started -- or ICE investigation started in 2002 in April,

4    and then I think the thing got resolved in 2005.

5    Q.        When you say "got resolved," you pleaded guilty;

6    is that right?

7    A.        Yeah, to a misdemeanor.

8    Q.        And Mr. Duran Ramirez was working for you at the

9    time of the conduct for which you pleaded guilty; is that

10   right?

11   A.        Yes.

12   Q.        And Mr. Duran Ramirez was working for

13   Mr. DeCoster at the time of the conduct for which

14   Mr. DeCoster pleaded guilty?

15   A.        He was working for me.

16             MR. THOMAS:  I object to the relevance of

17   Mr. DeCoster's violation, Your Honor, as well as a 14 year

18   old conviction for Mr. Glessner.

19             THE COURT:  Overruled.  I think it goes to -- I

20   think it's an entirely appropriate consideration with

21   regard to whether to release this defendant in light of the

22   very serious felony charges with which he now stands

23   charged.

24   BY MS. RICE:

25   Q.        Mr. Glessner --
```

```
1              THE COURT:  And it may also be a crime of moral
2     turpitude that might be a factor in the criminal history
3     calculation.  I realize it's a misdemeanor, but -- and I
4     realize it's more than ten years old, but I'll be candid
5     with you, it strikes me as a crime of moral turpitude to be
6     in a situation which you have people employed who are --
7     whom you know to be, or at least have pled guilty knowing
8     that they were here illegally.  Go ahead.
9     BY MS. RICE:
10    Q.          Mr. Glessner, are you aware that after
11    Mr. DeCoster pleaded guilty in 2003, that, again, in 2006
12    agents found 30 workers suspected of being illegal
13    immigrants at a farm that he operated in Iowa at which
14    Mr. Duran Ramirez was working?
15    A.          I don't recall that.
16             THE COURT:  And, counsel, I realize that I may be
17    confusing the evidentiary rule with the guidelines, so it
18    may be admissible at trial as a crime of moral turpitude.
19    I don't think it would play any role as a ten year old
20    conviction.  I don't know about that, so I will
21    disregard --
22             MS. RICE:  Your Honor, just to be clear, the
23    convictions are for Mr. Glessner and Mr. DeCoster.
24    Mr. Duran Ramirez was not convicted, he was working for
25    these men.
```

```
 1              THE COURT:  I'm sorry, I misunderstood.  And I
 2     withdraw that comment and will disregard it entirely.
 3              MR. THOMAS:  Thank you, your Honor.
 4              THE COURT:  But I think it is relevant that he
 5     was employed at a facility, the owners or operators of
 6     which were engaged in that kind of activity.
 7              MS. RICE:  Your Honor, at the same time --
 8     BY MS. RICE:
 9     Q.       I will not go through each of these, but are you
10     aware that again in 2007 the same thing occurred at a farm
11     that Mr. DeCoster was operating where Mr. Duran Ramirez was
12     working?
13     A.       I don't recall that.
14              THE COURT:  Do you know what capacity in -- what
15     Mr. Duran's capacity was during the period just alluded to
16     during which he was working with or working for
17     Mr. DeCoster?
18     A.       I don't believe so specifically, no.
19              THE COURT:  Okay.  Counsel --
20     A.       Again, he was working for me, not for DeCoster,
21     but he was at DeCoster sites.
22              THE COURT:  He was at DeCoster sites?
23     A.       Owned sites.
24              THE COURT:  Pardon?
25     A.       He was at DeCoster-owned sites.
```

1                THE COURT:  And what was he doing there for you?

2    A.          It would either be processing or production

3    management.

4                THE COURT:  Similar to work that he would be

5    doing for you in Alden?

6    A.          Yes.

7                THE COURT:  Having -- and in a capacity as a

8    person in that situation routinely have daily contact with

9    the people who are working under him and whose activities

10   he is overseeing?

11   A.          Yeah, he would have no hiring or firing

12   responsibilities.

13   BY MS. RICE:

14   Q.          Just one more question.  Are you aware that four

15   subcontractors working for Mr. Duran Ramirez have already

16   pleaded guilty in cases related this matter for harboring

17   illegal immigrants?

18   A.          I'm not sure on the number, three or four, but,

19   yeah, whatever -- I'm aware of the general circumstances.

20   Q.          And knowing that Mr. Duran Ramirez supervised

21   four people who have pleaded guilty to alien harboring, you

22   still feel comfortable hiring Mr. Duran Ramirez for a very

23   similar role in your company?

24   A.          It's a different role.  It's not the same role.

25   Q.          So at first it's construction, but then at some

1    point it turns into management; is that right?

2    A.        No, he hired -- he did -- he did bird services,

3    the way I understand Ohio, and had subcontractors doing the

4    work that would not be the similar to what his

5    responsibilities would be in Alden, Iowa.

6    Q.        Once your egg farms are up and running, will he

7    be responsible -- or would he be responsible for hiring

8    subcontractors?

9    A.        No.

10   Q.        Would he be responsible for supervising

11   subcontractors?

12   A.        Yes.

13             MS. RICE:  Nothing further, Your Honor.

14             THE COURT:  Counsel?  There's one thing you

15   testified that wasn't too clear.

16             Was it your testimony that when you encountered

17   Mr. Duran in Mexico -- first of all, where was that?

18   A.        Guadalajara.

19             THE COURT:  And how far is that from the American

20   border?

21   A.        I don't know, it's probably two-and-a-half hour

22   flight from Phoenix.

23             THE COURT:  Okay.  I don't know myself.

24             Was it -- did I hear your testimony correctly

25   that it came as news to Mr. Duran that he was under

1    indictment in this case --

2    A.        Yes.

3             THE COURT:  -- or that he was charged with

4    crimes?

5    A.        Yes, because he had been in communication with

6    his attorney.  His attorney never said anything, or his

7    attorney had never been contacted so he was not aware of

8    it.

9             THE COURT:  And who are his family members, and

10   what's their relationship in Iowa, and to your knowledge

11   family members, and what's their relationship to him and

12   the family members in Iowa?

13   A.        Mother, brother, brother's family in Clarion,

14   Iowa, about 30 miles from the Alden facility.  And then I

15   believe three other kids, son, two daughters, and then --

16   that are older, and then his current wife, and I believe a

17   two year old, four year old that are near the Hampton, Iowa

18   area.

19            THE COURT:  And I realize that borders perhaps

20   inappropriately, but I do not mean it in an unfair fashion

21   at all, but is it fair to say that Mexican families are

22   known as for families -- part of my own ethnic background,

23   Irish for being fairly close knit?

24   A.        Yes.

25            THE COURT:  And is it my -- is my recollection

1    correct, counsel, that one of the co-defendants in this

2    case, who has pled and whom I sentenced, was one of

3    Mr. Duran's sons, or am I totally mistaken on that?

4              MS. RICE:  You're correct, Your Honor.

5              THE COURT:  Okay.  Sir, you may continue.  Or I

6    guess it's -- I don't know whether you call it redirect or

7    whatever, but the ball has bounced back into your court.

8              MR. THOMAS:  Thank you, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. THOMAS:

11   Q.        Mr. Glessner, did Mr. Duran have anything to do

12   with your prior criminal case or Mr. DeCoster's prior

13   criminal case?

14   A.        No.

15   Q.        Second, let me clarify a time line, and I'll ask

16   you some questions about that for the benefit of The

17   Court's consideration.

18             When you were talking about Mr. Duran's

19   awareness, or lack of it from your perspective of a

20   warrant, was that in 2015?

21   A.        No.

22   Q.        Okay.

23   A.        '17.

24   Q.        2017.  But of course you did eventually become

25   aware of it; isn't that right?

1   A.        Yes.

2   Q.        So did Mr. Duran, right?

3   A.        Yes.

4   Q.        It was clarified sometime in 2017, or confirmed

5   sometime in 2017.  Would that be accurate?

6   A.        Yes.

7             MR. THOMAS:  That's all I have.  Thank you, Your

8   Honor.

9             THE COURT:  Okay.  And -- and the basis for your

10  understanding that he was unaware of the pendency of these

11  charges against him, your understanding of his unawareness

12  comes from him, or some other source?

13  A.        Well, I don't know.  I mean, I found out from a

14  reporter in California that said there might be charges

15  against him, but the government won't confirm them.  So

16  when I went down there and I met with his brother, and then

17  later we met that day with Pablo, then I said, you know,

18  are you aware of something going on in Iowa with this.

19            THE COURT:  Or Ohio?

20  A.        Excuse me?  Pardon me?

21            THE COURT:  I've tried to persuade my New York

22  born and bred wife that there's a difference between Ohio

23  and Iowa.  I'm not sure she's understood that from 50 years

24  of marriage, but that's neither here nor there.  But go

25  ahead.

```
1   A.         So eventually he got ahold of his attorney or
2   whatever, and I can't remember how, you know, everything
3   that happened after that.
4              THE COURT:  Okay.  But basically the source of
5   his unawareness of the pendency of these charges since
6   2015, is that -- what's the date of the indictment?
7              MS. RICE:  Your Honor, it was returned in 2016,
8   May of --
9   A.         '16?
10             MS. RICE:  Correct, Your Honor.
11             THE COURT:  And the proceedings, the sentencings
12  occurred when?
13             MS. RICE:  They occurred in the -- in April and
14  June of 2016.
15             THE COURT:  The indictment was returned when?
16             MS. RICE:  This -- the indictment against this
17  individual was returned in May of 2016.  The indictment
18  against the other individuals, is that what you're
19  inquiring about?
20             THE COURT:  Yes, the one --
21             MS. RICE:  That was in 2015, Your Honor.
22             THE COURT:  And he was not a part of that
23  indictment?
24             MS. RICE:  No, Your Honor.
25             THE COURT:  Okay.
```

1          MS. RICE:  He was referred to by initials in that

2    indictment, and his company was named in that indictment.

3          THE COURT:  But his name was mentioned in that --

4    in the course of those proceedings if memory serves?

5          MS. RICE:  Correct, Your Honor.

6          THE COURT:  And his son was one of those who pled

7    guilty, was convicted and sentenced?

8          MS. RICE:  Correct, Your Honor.

9          THE COURT:  And the sentencing occurred again?

10   Tell me --

11         MS. RICE:  The sentencing for that defendant, for

12   his son was in --

13         THE COURT:  For that defendant.

14         MS. RICE:  Was in April of 2016.

15         THE COURT:  And this indictment was returned?

16         MS. RICE:  May 2016.

17         THE COURT:  And a warrant was issued?

18         MS. RICE:  In May of 2016.

19         THE COURT:  And by then the son had been

20   designated and was at some institution?

21         MS. RICE:  Correct, Your Honor.

22         THE COURT:  So the son, in all likelihood --

23   well, we don't know.  There's no reason to believe that the

24   son, in fact, was aware that his father had been indicted?

25         MS. RICE:  As to the specific indictment being

1    returned?

2              THE COURT:  Yeah.

3              MS. RICE:  No.

4              THE COURT:  Okay.  Are you able to represent --

5    is very -- whether the government has any reason to believe

6    that this defendant or members of his -- including the

7    convicted son -- were aware of the return of this

8    indictment?  Just put a hold on that, and if it does, then

9    you can raise that at the appropriate time.  And if not,

10   that's fine too.  Okay.  No further questions?

11             MR. THOMAS:  No, Your Honor.  Thank you.

12             THE COURT:  Sir, you're free to go.

13   A.        Thank you, Your Honor.

14             THE COURT:  You're welcome to stay.  It is up to

15   you.  When is your flight?

16   A.        8:00.

17             THE COURT:  We will be done before 6:00, which

18   we -- or 5:00 which gives you time to get to the airport.

19   So, counsel, go ahead.

20             MR. THOMAS:  That's all the evidence on behalf of

21   Mr. Duran, Your Honor.

22             THE COURT:  Okay.  I gather that the proposal

23   would be to release him to the custody of relatives subject

24   to electronic monitoring, duty to report to submit to

25   supervision under the -- whether Southern or Northern

1    District of Iowa, whichever it would happen to be, and to

2    submit to whatever other conditions pretrial might consider

3    appropriate?

4         MR. THOMAS:  Yes, Your Honor, just consider --

5    just one other fact I'd like to proffer based on the

6    discussions and the questions The Court had for

7    Mr. Glessner.

8         I will proffer, I will represent that I reached

9    out to the government in the summer of 2017, I think in

10   June.  And that's -- discussions began, and that's when

11   things kind of solidified, so --

12        THE COURT:  June of?

13        MR. THOMAS:  2017, last summer, Your Honor.

14        So that's when this counsel kind of resumed his

15   work in this matter.  So I just wanted to offer that as the

16   pin, in some ways, that The Court was referring to.  But

17   that's all the additional information I had.  You're

18   correct on the conditions we propose.

19        THE COURT:  Okay.  And do you have anything

20   further to offer in that regard before I hear from the

21   government?  And I'll let you finish up.

22        MR. THOMAS:  No, Your Honor.  Thank you.

23        THE COURT:  Counsel?

24        MS. RICE:  Thank you, Your Honor.  I'd like to

25   start out by reiterating, as Mr. Thomas did, that this is a

1   rebuttable presumption of detention because --

2          THE COURT:  I have to be clearly -- the standard

3   is clear and convincingly -- convinced that -- I have to be

4   clearly convinced that there are no -- no conditions

5   reasonably sufficient to ensure his appearance at trial?

6          MS. RICE:  Correct, Your Honor.

7          THE COURT:  And danger to the community?

8          MS. RICE:  Correct, Your Honor.

9          So with that being said, the government submits

10  that there -- defendant has not overcome the presumption of

11  detention in this case.

12         THE COURT:  Why not?

13         MS. RICE:  With respect to flight, as Mr. Thomas

14  indicated, we spoke in the summer of 2017.  And while the

15  indictment against Mr. Duran Ramirez was under seal, I did

16  confirm that there is a warrant pending for his client's

17  arrest, and if his client did not -- that I would impute

18  knowledge to his client of that warrant, and that was

19  understood.

20         THE COURT:  Via counsel?

21         MS. RICE:  Correct, Your Honor.  There were

22  additional conversations throughout the summer and early

23  fall attempting to negotiate Mr. Duran Ramirez to turn

24  himself in.  The United States offered for him to turn

25  himself in at the U.S. Embassy in Mexico.  We never heard a

```
1    response to that, and, instead, this defendant crossed the
2    border through a river, not at a border crossing.
3              THE COURT:  Is it illegal for me if I want to,
4    let's say, go to Canada to -- instead of going over the
5    Ambassador Bridge between Detroit and Windsor to, you know,
6    get in a boat and go over to Point Pelee and wander forth
7    from there?  I assume there's no port of entry at Point
8    Pelee, or some other place where there's no ordinary port
9    of entries.  Is it the American law that even American
10   citizens returning from abroad, in order to enter legally
11   must do so through a port of entry, or does that apply only
12   to foreign-born aliens, if you know?
13             MS. RICE:  I don't know the answer to that, Your
14   Honor.  I'm not implying that this --
15             THE COURT:  But I assume --
16             MS. RICE:  This entry was --
17             THE COURT:  I assume that you would argue, and
18   I'll hear Mr. Thomas in response, that there is some degree
19   of adverse inference that I can draw that he didn't show up
20   in an ordinary point of entry as an American citizen?
21             MS. RICE:  That's correct, Your Honor.
22             THE COURT:  He might have encountered a warrant
23   or background check and been apprehended there.
24             MS. RICE:  Correct, Your Honor.  And I've
25   submitted to The Court and provided to --
```

```
 1              THE COURT:  That's a valid consideration for me

 2    to take in evaluating the risk of flight.

 3              MS. RICE:  Correct, Your Honor.  I've submitted

 4    what's marked as Government's Exhibit 1, which is the

 5    summary of this defendant's statement at the time of his

 6    arrest at the border.

 7              THE COURT:  I can't read print.  I've got macular

 8    degeneration.  I can read screens.

 9              First of all, Mr. Thomas, have you seen and

10    reviewed this with your client?

11              MR. THOMAS:  Yes, I have.

12              THE COURT:  You've been able to do so in Spanish

13    with Ms. Donahue or yourself?

14              MR. THOMAS:  It was reviewed at the last hearing,

15    Your Honor.

16              THE COURT:  Pardon?

17              MR. THOMAS:  We reviewed it with him at the last

18    hearing.

19              THE COURT:  At the initial appearance before

20    Judge Knepp?

21              MR. THOMAS:  Yes.

22              THE COURT:  Okay.  Counsel, if you may be -- I

23    have a vision condition, I can't -- print is extremely

24    difficult, especially single space, doesn't help if big

25    type, it's just -- the IPad screen is no problem.  But go
```

1    ahead just summarize for me.

2           MS. RICE:  Sure, Your Honor.  It's actually just

3    one sentence that I'd like to highlight for The Court.

4    This is by Border Patrol Agent Hernandez who wrote I asked

5    him, referring to this defendant, why he had not gone to

6    the port of entry, and he, this defendant, stated that

7    because he knew of an arrest warrant that he had and did

8    not want to risk getting caught at the port of entry,

9    which, in fact, as we now have confirmed here today, this

10   defendant did have an arrest warrant which he knew of since

11   the summer.

12          THE COURT:  That would -- that's direct proof

13   that he knew.  And when was that that he -- that was after

14   the interview with the gentleman that just testified?

15          MS. RICE:  Correct.  That was December 24th of

16   '17, Your Honor.

17          THE COURT:  When was the interview with the

18   gentleman that just testified?

19          MS. RICE:  He said -- I believe he said the fall

20   of '17, Your Honor.

21          THE COURT:  Okay.  And that was after issuance of

22   the warrant?

23          MS. RICE:  After the issuance of the warrant and

24   after conversations with Mr. Thomas.

25          THE COURT:  And those conversations began

1    sometime in June did you say?

2              MS. RICE:  Summer of 2017, approximately June.

3              THE COURT:  June, July, August, but before

4    September?

5              MS. RICE:  Correct.  I would also add, with

6    respect to risk of flight, there is information the

7    government received from family members that at the time of

8    the raid of the trailer park, which was December of --

9              THE COURT:  Outskirts of Marion?

10             MS. RICE:  Correct, Your Honor.  December of 2014

11   and then into early 2015, this defendant told his son that

12   he should flee to Mexico to avoid charges.  And shortly

13   thereafter, based on what we learned, is when this

14   defendant went to Mexico.

15             THE COURT:  Shortly after --

16             MS. RICE:  After that conversation with his

17   son --

18             THE COURT:  Conversation --

19             MS. RICE:  -- and that he --

20             THE COURT:  Go ahead.  When did that occur?  You

21   may have told me and I missed it.

22             MS. RICE:  No, to the best of our knowledge,

23   early 2015.

24             THE COURT:  Okay.

25             MS. RICE:  So with respect --

1          THE COURT:  Again, was that prior to the actual

2   filing of the indictment, do you know?

3          MS. RICE:  That was.  So that was --

4          THE COURT:  Roughly, again, these are -- at some

5   pointed time lines get a little fuzzy.  I've got it.

6          MS. RICE:  So with respect to risk of flight,

7   Your Honor, the government submits that this defendant has

8   not overcome his burden by clear and convincing evidence,

9   and there are no conditions that can assure his appearance.

10          THE COURT:  Okay.

11          MS. RICE:  With respect to danger to the

12   community, Your Honor, the government has grave concerns if

13   he is released to the fact that he would be working in an

14   environment very similar to the one where he is facing

15   these charges.

16          THE COURT:  Well, I would doubt that the

17   gentleman who just testified would be responsible for

18   conditions similar to which at least some of these 14 year

19   old and older children were exposed.  I can't imagine

20   that --

21          MS. RICE:  Let me clarify.  By conditions I mean

22   circumstances where he would oversee contractors.

23          THE COURT:  The kind of what work that he would

24   be overseeing?

25          MS. RICE:  Correct.

1            THE COURT:  Basically the care, et cetera, et

2    cetera, for the chickens?

3            MS. RICE:  Yes.

4            THE COURT:  Working in the chicken barns and

5    elsewhere?

6            MS. RICE:  Correct, Your Honor.  And so for all

7    of those reasons, we ask that this defendant remain

8    detained pending resolution of that matter.

9            THE COURT:  Okay.  Counsel?

10           MR. THOMAS:  Your Honor, thank you.  I'll take

11   things kind of out of legal order to respond to the

12   government's comments if that's okay.

13           THE COURT:  Pardon me?

14           MR. THOMAS:  I'll take things out of the legal

15   order in order to respond to comments?

16           THE COURT:  That's fine.

17           MR. THOMAS:  In terms of danger to the community,

18   Mr. Duran is simply not --

19           THE COURT:  Candidly I tend to agree.  All other

20   things being equal or -- there not being any concern of

21   flight, I would not detain him or consider detaining him on

22   the rather hypothetical risk of, you know, danger to the

23   community.  I think the issue here is one of risk of

24   flight.

25           MR. THOMAS:  Then I'll move on from that, Your

1    Honor.  And that is -- I would submit that were it not --

2             THE COURT:  Let's put it this way:  Candidly I

3    don't know whether technically somebody else other than I

4    looking at it could say that, no, Judge, you can't reach

5    that degree with clear and convincing, but I'm willing to

6    say I'm not worried about that.

7             MR. THOMAS:  Thank you, Your Honor.

8             THE COURT:  Whatever the standard is, I'm not

9    worried about it.

10            MR. THOMAS:  Okay.  Then I will confine my

11   comments to risk of flight.  And I would submit that were

12   it not for the circumstances of Mr. Duran's arrest, he

13   would otherwise be a very good candidate for release, and

14   we would have overcome the presumption.  He's a citizen.

15   He has no record.  He has strong family ties in Iowa.  All

16   the factors support that, in fact, he's not a risk of

17   flight.  There's just no reason to believe he is.  And the

18   time line of the investigation is relevant as well.  He may

19   or may not have become aware of the investigation in early

20   2015, but at that time there was nothing unlawful about his

21   travel or his decision to leave the United States.  We

22   agree that in 2017 he became aware of a warrant for his

23   arrest.  We're not disputing that.  And he was -- he was

24   apprehended crossing the border.  But that's consistent

25   with the evidence that we offered through Mr. Glessner's

1    testimony, which is that he was wrong headedly perhaps, but

2    he was apprehended returning to the country.  He identified

3    himself.  There's no evidence that he tried to pass himself

4    off as another person.  He acknowledged that there was a

5    warrant for his arrest.  And, in fact, the circumstances of

6    his arrest are consistent with what Mr. Glessner said,

7    which is that, you know, he wrongly, but in some ways

8    understandably, wanted to take care of his family affairs

9    and was headed in the direction of Ohio.  So the only real

10   distinguishing characteristic is that he was arrested by

11   the border patrol at the Rio Grande River.  And I would

12   submit balancing that against the very compelling evidence

13   of where he can live, where he can work, and his own

14   personal characteristic and history, I would submit that we

15   have overcome the presumption and that release on the

16   proposed conditions would be appropriate.  Thank you.

17          THE COURT:  I disagree.  I think there's a

18   crucial piece of evidence that, through oversight, I

19   presume you did not comment on.  And that was the

20   conversation with his son.  That was when, as far as both

21   of them were concerned, there was an apparent or potential

22   risk of prosecution.  Apparently raid had occurred, but

23   there's neither complaint nor indictment returned at that

24   moment.  And even though at that point the potential

25   prosecution could be apprehended, but was not a fact and

1    nonetheless not only did he go to Mexico, but he urged his

2    son to do likewise.  And that's certainly so -- is to me an

3    impulse at least to avoid prosecution.  The fact that he

4    has returned, I'm not quite as willing to credit the -- it

5    was just kind of a mistake that he foolishly sought with

6    knowing that there was a warrant and foolishly sought to

7    evade apprehension through that legal process seems to me

8    to be somebody who's willing to say here I am, come get me,

9    would have walked up through the border through ordinary

10   border crossing and say here I am, you're going to find I

11   have an arrest warrant, take me into custody, and I -- I am

12   returning voluntarily in order to answer to those charges.

13   And this destination, by all accounts, and everyone agrees,

14   is acknowledged a destination that was return to his family

15   in Iowa, and as far as we can tell, based on this record,

16   coming the next 400 or 500 miles to Toledo, Ohio, was not,

17   in my view -- so surely and certainly in the cards that I

18   can really trust that, particularly when he is resident in

19   Iowa, living with a number of family members, none of whom

20   is here, none of whom has undertaken to say they would be

21   third-party custodians, the backgrounds of whom I have no

22   knowledge.  So I'm willing, for the purposes of this

23   decision today, to say none of them has any criminal record

24   or involvement, and that he simply has no ties to this

25   community, and this community is where this prosecution's

1   occurring.  He has nothing to do but go any further than

2   reading the transcript of my remarks at sentencing to gain

3   an impression how this judge feels about persons convicted,

4   at least of the kind of activity that Mr. Serrano and the

5   young woman were responsible directly for -- directly for

6   subjecting these children to the conditions in which they

7   were forced, I believe truly against their wills.  Three of

8   them spoke, gave victim impact testimony.  That testimony

9   was compelling, and brought clearly to mind, to my mind at

10  least in a rather graphic way, the true nature that

11  motivated those persons responsible, I understand as he was

12  not, but directly responsible for diluting the parents,

13  diluting the children, smuggling a large group of people

14  across the border.  Apparently, according to the

15  government, involved some kind of pay off to somebody

16  successfully, and that's not easy to do, getting those

17  children to Northwest Ohio, perhaps elsewhere, and then

18  most -- both Mr. Serrano and the woman, who at the time was

19  I think 19 or 20, at the time of trial was 21, I think was

20  21, they were directly familiar and responsible for the

21  conditions in which those conditions were held.  But at

22  this point I presume that Mr. Duran may not have been aware

23  of the conditions, I'm willing to give him, in addition to

24  the presumption of innocence, I think that the likelihood

25  of conviction is fairly substantial.  But I realize also,

1   if I recall the role attributed to Mr. Duran in the course

2   of the sentencing proceedings, because none of these cases

3   proceeded to trial, but it was -- I suppose could be

4   described as a facilitator -- facilitator or enabler.  He

5   was the one who made whatever arrangements were made with

6   the egg farms as I understand it.  If I'm -- I'm trying to

7   say his culpability may have been in a lesser role.

8   Certainly I attributed the greatest degree of evil intent,

9   which is what it was in several levels and ways, to

10  Mr. Serrano and to the young woman.  But in any event, he's

11  looking, if convicted, as I think there's a fair

12  likelihood, you never know, okay -- like everything else in

13  life, the cards when you pick them up they look a lot

14  different as the game gets played.  You may think you've

15  got a winning hand, but by the time it's over you toss the

16  cards in and case is dismissed and off you go.  He is

17  presumed to be innocent.  But in this case, as hardly ever,

18  I find that clearly and convincingly there's simply no

19  conditions of release that have been -- that have been

20  offered to me here today that are sufficient to persuade me

21  that the risk of flight isn't so substantial that it cannot

22  be overcome with those conditions -- proposed conditions.

23         I should also note it is of concern to me that he

24  has family in Mexico as well as in this country.  So if he

25  were to wake up one morning and decide to take off, there's

1    nobody presently before me who said that -- who says -- can

2    say to me, Judge, I will ring the alarm bell, I will let

3    you know.  And he can be in Mexico before anybody might

4    even have any idea, even with the electronic monitoring.

5    And once there, he would have -- he would not be like so

6    many people -- I'm going to Las Cruces in a week, I'm going

7    to sentence 120 people.  I've sentenced three people here

8    this week on immigration offenses.  So many people who are

9    as American as you or I, they were brought over as young

10   children, everybody else became a citizen, they got some

11   kind of trouble.  They speak better English than Spanish.

12   They don't know anybody in Mexico, they don't know

13   anybody -- I don't know anybody in Mexico.  That's not his

14   case.  That's not something that weighs in his favor

15   because he has, in fact, family ties in Mexico.  And were

16   he able to depart Iowa, and were he able to avoid

17   apprehension and able to get back to Mexico, none of which

18   are beyond the realm of possibility, not probability but

19   possibility, he could successfully evade prosecution, just

20   as I think he undertook to do when he first apprehended the

21   prosecution with the potentiality.  For whatever reason he

22   chose to come back.  I'm not willing, at this point, to

23   credit that desire, at least not exclusively, to show up

24   some day in Ohio.  I realize he was working with you.  He

25   was not subject to your direct and immediate control.  I

 1   have no doubt whatsoever you, as a competent attorney --
 2   and I don't think we've met before, but certainly your
 3   reputation as a capable and competent attorney preceded
 4   you.  I look forward to working with you, and I have no
 5   doubt that you were encouraging him to come promptly, face
 6   the charges, plead not guilty, and if he so chose, to go to
 7   trial.  I really don't think so.  I mean, if I did, trust
 8   me, I'd let him go.  My default is release.  But in this
 9   case, I think I must abide by the presumption.  And I'll be
10   very candid with you, presumption cases, I'll be honest, I
11   rarely pay real attention to it.  I just have to know --
12   and rarely is -- is appearance.

13          I mean, I had the third person in 38 years fail
14   to appear.  One was a book maker who fled to Mexico, pulled
15   the gun in a saloon down there.  Their federality (sic)
16   called ours and said he'll be at the Brownsville Bridge.

17          Second was abortion clinic bomber, charged with
18   it.  If I released her to -- her husband said this nonsense
19   ends here today.  That's why I thought she would show up.
20   She betrayed not only my trust but her husband's trust.
21   She was caught at 4:00 in the morning coming down the front
22   steps of a rooming house in New Jersey.  Somehow the ATF
23   happened to be driving down the block at 4:00 in the
24   morning and caught her before she made it around the corner
25   to the abortion clinic.  Obviously they knew where she was.

1          And last one was some guy who could never -- he

2     went down to Alabama on his own.  Jordan, is that your

3     case?  Jordan comes in and says -- I can't remember his

4     name.  He's gone to Alabama.  I said, Jordan, what should

5     we do?  He didn't have permission.  He didn't let Jordan

6     know.  Well, he wants to be with his family.  He knows

7     pretty much that was it, wasn't it?  And I said, okay, how

8     many Judges would do that, the shrug of the shoulders.  The

9     guy goes to Alabama.  Well, marshals finally found him with

10    his girlfriend in Chicago.  That's the third person I've

11    ever had run, and I rarely encounter -- except with

12    foreign-born nationalists, natives or people who don't have

13    an American citizenship or whatever.  I'm rarely concerned

14    with risk of flight.

15         How often in your career have you seen, no matter

16    what a judge said or magistrate judge, somebody who had the

17    wherewithal, or the real ability to flee, and whom, you

18    know -- and I know what every good lawyer does with

19    everybody in this court, they say you've got a break

20    getting out.  You heard The Judge, do well, six months,

21    nine months, 18 months, however long it takes.  You come

22    back and Judge Carr is going to take that into

23    consideration.  Don't do well, Judge Carr, who hates the

24    guidelines, he's going to take that into consideration.

25    Once in a while I have been heard to say how high is up.  I

1    vary a lot, rarely in that direction, but every once in

2    awhile -- I have no point going up.

3           My whole point is risk of flight is a very rare

4    risk even when the government -- let me say I had a

5    terrorism case.  Government, at the outset, made clear for

6    all five defendants wanted life imprisonment.  One

7    terrorism case, I had two defendants who were from Chicago,

8    knew Toledo barely at all.  I had a million dollars of gas

9    and convenience stations in Chicago property bonds.  I

10   figured they would be safer coming back here than going

11   anywhere else.

12          Same -- I had two, a married couple who, with

13   FBI -- they must have sent a million dollars of FBI money

14   to Hezbollah.  They were holding the money in the rocket

15   panels of the Jeep when the FBI decided to come get its

16   money back.  I let them both out even though one was not

17   native born.  They have three children here.  And I took a

18   million dollars of very nice property in the Toledo area,

19   and they went back to Lebanon to be in the Pegon (phonetic)

20   Valley, and they knew they were a lot safer being here

21   facing the charges and the prison term they got here rather

22   than fleeing the Pegon Valley where aunts, uncles,

23   brothers, sisters, moms, dads were still there, than

24   stiffing friends and neighbors here in Toledo, which I

25   would have taken.

1          My whole point is, I rarely find a risk of flight

2     sufficient that I cannot run the risk of letting them out.

3     But I think the risk of flight here is very substantial,

4     and I do not think that the conditions that have been

5     proposed are sufficient to overcome it.  He's very

6     fortunate that he has that gentleman who's known him, knew

7     of these charges, come work for me, you've done a good job

8     for me for 20 years.  And Mr. DeCoster, regardless of the

9     trouble he's been in, he's willing to vouch for him and say

10    I'll give him a job, I'll pay him $100,000 a year -- help

11    to pay you.  In any event, he's got family there, but,

12    nonetheless, the multiplicity of factors persuade me that

13    there are no conditions sufficient -- excuse me, sufficient

14    reasonably to assure his appearance.

15         If you wish to appeal my decision, by all means

16    you all can do so.  I hope -- and think I've said

17    everything that I would say in a written order.  If you

18    want me to prepare a written order, let me know, but I

19    think I've made my views clear.  Okay?

20         MR. THOMAS:  Understood.

21         THE COURT:  Anything further, counsel for

22    government?

23         MS. RICE:  Not on behalf of the United States,

24    Your Honor.  Thank you.

25         THE COURT:  Okay.  Let's -- has there been

1    arraignment yet?  Was he arraigned?

2            MR. THOMAS:  Yes, Your Honor.

3            THE COURT:  Okay.  Why don't we set a time table,

4    okay, while you're here.  Take five minutes.  I know the

5    record's open file are a no no, dirty phrase, but in this

6    division, historically since I became magistrate and urged

7    the government and good friend of mine who's in the AUSA --

8    two good friends of mine were the AUSAs, and I said, as a

9    law professor with the usually willy-headed thoughts that

10   the law professors have, Pat, do you do open file

11   discovery.  I said, Pat, why not.  The well-informed

12   defense attorney's your best friend, even though in the

13   eastern division I understand they do things differently.

14           So let me ask counsel, is it the government's

15   expectation that regardless of what you call it, that it

16   will follow the customary practice in this division of

17   basically making the defense attorney, and through his

18   attorney, the defendant, aware of all or substantially all

19   of what is known to the government?

20           MS. RICE:  It is our intention, Your Honor,

21   subject to protecting the identity of the victims.

22           THE COURT:  Absolutely.  Of course.  Is

23   April 13th enough time for a motion filing deadline?  I

24   mean, you probably have a pretty large -- have you gotten

25   all the discovery yet, or is it still --

1          MS. RICE:  Your Honor, we met last week.

2          MR. THOMAS:  Two weeks ago.

3          MS. RICE:  Two weeks ago, to provide a preview of

4    Jencks --

5          THE COURT:  Okay.

6          MS. RICE:  -- and outlined the categories of

7    evidence.  The actual physical documents should be sent to

8    defense next week.

9          THE COURT:  How -- how extensive are they?

10         MS. RICE:  Well, there's significant amount of

11   financial records that are voluminous.

12         THE COURT:  You fill in the blank, okay.  I know

13   that you don't want your client in custody longer awaiting

14   the outcome of this case, whatever it may be, but I think

15   April 13th is kind of -- my view is, counsel, you tell me

16   what is a comfortable time within which you can acquaint

17   yourself with the evidence, determine whether there is

18   anything in there, or otherwise in conversation with your

19   client, whether there's anything either to challenge the

20   indictment or to seek to suppress one thing or another.

21   I'll be candid, it would seem to me in this case, there's

22   no other statement following arrest except for one item

23   we've already heard that I don't think it would be an

24   admissible.  That's my own thought.  I don't see anything

25   in that that would be admissible, so you don't have any

1    post-arrest statements.  There was nothing searched and

2    seized from him, or was there --

3            MS. RICE:  There were searches.

4            THE COURT:  And he might have financial records

5    standing challenge?

6            MS. RICE:  Searches of the trailers, but nothing

7    related to this individual defendant.

8            THE COURT:  Okay.  So there's probably no Fourth

9    Amendment -- I'm just speculating, but --

10           MR. THOMAS:  Judge --

11           THE COURT:  Whatever time you want to -- counsel,

12   you fill in the blank.  April 13th seems to me a pretty

13   brisk date, but if that's what, that's fine.

14           MR. THOMAS:  Based on the evidence as I

15   understand it today, I can comply with the April 13th

16   deadline.  If that changes, I would -- I can submit a

17   motion or otherwise bring it to The Court's attention.

18           THE COURT:  Okay.  Well, if the case goes to

19   trial, how long will it take to try?

20           MS. RICE:  I would -- the government would

21   anticipate approximately two weeks for its case.

22           THE COURT:  Okay.  Why don't we do this, why

23   don't we have a status conference maybe the first Monday in

24   May.  If there are any motions, it's not necessary for the

25   government to respond to them until we have that

1    conference.  But as I say, I doubt whether there will be,

2    but you never know.

3         Mr. Thomas, you're probably not aware, I'm no

4    longer resident in Toledo.  I come back a week a month to

5    do the things I need to do, like this.

6         MR. THOMAS:  Understood.

7         THE COURT:  And probably, if there's going to be

8    a two-week trial, I would probably have it transferred to

9    Judge Helmick or Judge Zouhary for trial.  Obviously if it

10   were to result in resolution without trial, I would retain

11   it.  But at that time -- let's make it mid May.  And this

12   is not to say that I have an expectation or -- and it is

13   not to diminish in any way the defendant's presumption of

14   innocence for -- or any other Judge try the case were the

15   case to proceed too trial.  But I would like to give you

16   enough time, and if that's not enough time, say so, and it

17   may not be, to familiarize yourself fully and thoroughly

18   with the evidence -- perhaps to acquaint yourself with

19   whatever else the evidence, you know, whatever else is

20   there, in addition sort of the -- the bigger picture, and

21   to at least give some thought between you and your client

22   whether to proceed to trial or not.  I don't expect that

23   you will.

24        This case was indicted differently.  I didn't

25   realize it for some reason.  I just had the sense that it

1    had been -- that this was not a new indictment, but there

2    was a leftover from the other one.  Not that it matters.

3    And so how much time do you think you need, aside from

4    motions which are probably pretty unlikely, really kind of

5    vary fully to penetrate the evidence, information evidence,

6    talk to the prosecutor, perhaps retain an expert?  And let

7    me say, Mr. Thomas, I presume that you are presently

8    retained.  However, if the funds readily available to you

9    and your client become exhausted, I would probably want you

10   to submit, under seal, an affidavit of indigency if that

11   were to be the fact.  I think it would be appropriate to

12   put it under seal because of the government's allegations

13   about the earnings generated.  But my whole point is if you

14   run out of money and need to hire an expert to pay

15   yourself, feel free to apply.

16        MR. THOMAS:  Understood.

17        THE COURT:  I don't consider that to be my money.

18   I consider it to be the defendant's money in terms of -- I

19   really do enable him to enjoy the kind of defense I'm sure

20   you'll give him.  But you may need to get experts, I would

21   think, to look at the financial records.

22        MR. THOMAS:  Judge --

23        THE COURT:  It's up to you.  I'm glad to give you

24   as much time -- and I do think that, I would assume as a

25   capable defense attorney, at some point you'd want to sit

1    down and go over that stuff.  May take several visits from

2    Columbus -- I think you're in Columbus, right?

3              MR. THOMAS:  Yes, sir.

4              THE COURT:  He'll be at either CCNO, which is an

5    hour-and-a-half from here, okay.  So basically come up 23

6    and take a left, more or less, to get out somewhere in

7    Northwest Ohio out there.  So I can imagine -- there is

8    video hook up, and you might -- I don't know if the hook up

9    runs from the Southern District up here.  I know it's

10   from -- public defender has a hook up.

11             MR. THOMAS:  It does, Your Honor.

12             THE COURT:  Okay.  Is there one in the Southern

13   District as well?

14             MR. THOMAS:  Yes, sir.

15             THE COURT:  Good.  Great.  Terrific.  That makes

16   things a bit easier.

17             MR. THOMAS:  Judge, if I can just offer a comment

18   on the time for defense preparation if now is the

19   appropriate --

20             THE COURT:  Absolutely.  It's your case.  You

21   tell me what you need.

22             MR. THOMAS:  Well, it's their case, but I

23   appreciate that very much, Judge.  The documents are kind

24   of one thing.  Where we see substantial defense preparation

25   really being required is actually going to be in

1    investigation.

2              THE COURT:  Sure.

3              MR. THOMAS:  We're anticipating a lot of

4    co-conspirator testimony which would require a lot of

5    defense investigation to those co-conspirators and other

6    individuals.  Specifically we anticipate some of the

7    victims that the government referred to.  Those individuals

8    are probably scattered all over the country.

9              THE COURT:  My understanding, counsel, and I

10   don't think I'm breaching any confidence, I don't know

11   whether they -- several have been -- several, she can

12   probably tell you, have been placed successfully with

13   American foster parents, and they may be anywhere in the

14   country.

15             MR. THOMAS:  Right.

16             THE COURT:  I don't know.  I do know that a

17   number of them, I believe -- counsel, you can correct me

18   because I don't want to -- I don't want you or certainly

19   your client to draw any adverse inferences about my mind

20   set about this case if I misstate something, okay --

21             MR. THOMAS:  Thank you, Your Honor.

22             THE COURT:  -- but, you know, with old timers

23   disease and creeping decrepitude advancing as though both

24   are in the case, though it was striking, in many respects,

25   that maybe things that I simply don't remember correctly.

 1    But I do think some of the victims expressed some

 2    substantial concern for their welfare and their families,

 3    some may have gone back to Guatemala to the small village,

 4    I don't know.  I think the government can at least, to the

 5    extent it's willing to do so, can obviously -- I don't

 6    think it knows the whereabouts of somebody who's readily

 7    available in the United States.  Obviously I think would

 8    not be appropriate or permissible for the government to

 9    conceal their place of location and keep them from you.  I

10    don't know.  That's up to it.  But anyway, I would

11    certainly hope not.  I understand what you're saying.

12            MR. THOMAS:  If we had to try the case, I would

13    think it would take the defense at least six months to

14    prepare.

15            THE COURT:  Okay.

16            MR. THOMAS:  Again, I'm kind of --

17            THE COURT:  When would you like, June?  You tell

18    me when I feel the pulse of the case and see what you're up

19    to.

20            MR. THOMAS:  Your Honor, I think a June status

21    would be appropriate.  And if circumstances were to change,

22    the government has been very accommodating in

23    communication.  If the circumstances change, we can call

24    that to The Court's attention.

25            THE COURT:  We have a spectacular splendid United

1    States Attorney.  Don't tell President Trump or

2    Mr. Sessions what I'm about to say, Angela.  Angela, do you

3    understand?  Seriously, I was over for a Judge's meeting

4    when we heard that Justin Herdman had been designated,

5    universally the four or five of us were there, along with

6    Ava -- Ava Dustin is the one that told us, I think she can

7    tell you jubilation on part of the judges in this district

8    upon hearing that Justin Herdman had been appointed was

9    universal and constrained.  Our concern was that somebody

10   would find out about it.  He's first rate.  He is not -- he

11   is a zealous, effective and fair advocate for the United

12   States Government.  He was in a couple -- at least the big

13   Amawi case, terrorism case, and he's a thoroughly decent

14   human being.  And I think if -- I think he's an Ed Sargus

15   type.  I'm not sure that Ed was the same sort of U.S.

16   Attorney as he is Judge.

17           MR. THOMAS:  Yes, sir.

18           THE COURT:  And I told Justin when I called him

19   to congratulate him, I'd like to see him on the 20th floor

20   some day at our meeting, but who knows.  I think you'll

21   find that certainly is the way we do business over here,

22   extend every professional courtesy, go out of our way to

23   work in an entirely professional manner.  There may be

24   things that the government feels, whether in the interest

25   of protecting any of the children or otherwise that it

1    can't share with you, can and share in a redacted form.  If

2    you have some problems in that regard, you really find

3    yourself -- you think something in good faith is being

4    withheld because it will not be withheld in bad faith.  I

5    can assure you, unless my experience with these lawyers

6    is -- would be an entire indication of the contrary.

7           So let's do that, maybe June, maybe the second

8    Monday in June?  Deanna.  Let's leave that a little bit --

9    I don't know when I'm coming back in June.  We've been

10   talking about June 11th, right?

11          COURTROOM DEPUTY:  Yes.

12          THE COURT:  What about that Tuesday?  I mean,

13   June 11th's pretty full, I assume, right?

14          MS. RICE:  Your Honor, if we could set it either

15   the 5th or the 19th, I'll be out of town that week of June,

16   the week of June 11.

17          THE COURT:  Are you citing Rule 1 of the

18   unwritten rules of practice as grounds for a continuance?

19          MS. RICE:  I don't know Rule 1, but it sounds

20   like yes.

21          THE COURT:  A vacation is always a good reason

22   for a continuance.

23          MS. RICE:  Yes, Your Honor, Rule 1.

24          THE COURT:  When you get an order that says

25   whatever continued to whatever due to conflict in Judge's

1    schedule, I'm going to play with my grandchildren.  Let's

2    make it the 19th, Deanna.  I know I'll be -- Mr. Thomas,

3    unless you want to travel to Arcadia, Michigan to attend

4    that conference in person, you're welcome to do so by

5    phone.

6              MR. THOMAS:  Oh, I am?  Great.  Thank you, Your

7    Honor.

8              THE COURT:  The 19th.

9              MR. THOMAS:  The 19th is great then.

10             THE COURT:  Let's say 9:00.

11             MR. THOMAS:  June 19th, 9:00.

12             THE COURT:  We'll just take the pulse, maybe

13   let's see a week before.  You'll be gone a week before.

14   Maybe ten days before.  Before you take off give me a

15   status report with an agenda, time tables, things we need

16   to talk about, problems you might have.

17             Mr. Thomas, if at any time funds become an issue,

18   as they may, do not hesitate to apply -- I will raise an

19   eyebrow about the monies that the government alleges were

20   obtained, whatever information you disclose will be under

21   seal, and whatever it is one way or the other, it will not

22   affect my judgment.

23             MR. THOMAS:  Thank you, Your Honor.

24             THE COURT:  If I try the case, and candidly goes

25   to trial, I think it's fairly unlikely, what I will do is I

1    will remain with the case, adjudicate whatever pretrial

2    motions and so forth, get you up to the point where

3    there'll be a deadline for motions in limine and deadline

4    for proposed preliminary jury instructions and jury

5    questionnaire.  It's my habit -- I think it's at least

6    Judge Helmick's, probably Judge Zouhary's, he's very

7    attentive to jurors and their needs, I think all three of

8    us probably -- at least I know I do, I give a preliminary

9    charge, just introduce the jurors to what their duties are

10   and to the elements of the offense so that they know

11   they've got a road map.  The jurors love that quite

12   candidly.  You then would be at least entitled, in front of

13   me, and she would be entitled to say, ladies and gentlemen,

14   The Judge has told you that among the things we must prove

15   is X, prove X.  Ladies and gentlemen, we're going to be --

16   we're going to be calling Special Agent so and so and so

17   and so and Ms. So and so.  So okay.

18            But let's wait -- we'll wait until the 19th of

19   June and we'll talk.  If anything comes up in the meantime,

20   let me know.  Okay.  And once again, if by then you think

21   that maybe yet another span of time is useful to you before

22   you really get in a position to know, A, what direction

23   you're headed and, B, in the event if it's trial, how much

24   additional time is needed to get yourself ready, that's

25   fine.

1           I'm going to designate this case a complex case

2     under the Speedy Trial Act.  Sure sounds like it,

3     particularly -- even though it's a one defendant, three

4     count case, that's the tip of the ice burg in terms of what

5     involves for both the government and especially for defense

6     counsel.  Likewise, if you want to hire an investigator at

7     government expense, if you're client, in fact, is unable to

8     do so, I almost never require the affidavit, but this time

9     I probably should.

10          MR. THOMAS:  Understood.

11          THE COURT:  Counsel, anything further?

12          MS. RICE:  No, Your Honor.  Thank --

13          THE COURT:  I hope I haven't made you late for

14    your flight back to Washington.

15          MS. RICE:  No, Your Honor.  It's not until 6:00.

16    I always know to make it late.

17          THE COURT:  My rule as a Judge is never late,

18    sometimes custody --

19          MS. RICE:  That was not about your timing, Your

20    Honor.

21          THE COURT:  What did I do this Monday, Your

22    Honor, Deanna, 8:30, with nobody else in the courtroom, I

23    let the record show I was on time.

24          Anyway, thank you very much.  Have a pleasant

25    weekend, and I'll talk to you mid June.  Have a pleasant

1    vacation.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      C E R T I F I C A T E

2

3              I certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       s:/Angela D. Nixon                 June 3, 2018

7       --------------------------                  -----------

8       Angela D. Nixon, RMR, CRR        Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```