IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 3:16CR166 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | |
| | ) | |
| PABLO DURAN RAMIREZ | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM AS TO |
| Defendant. | ) | PABLO DURAN RAMIREZ |
| | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Chelsea S. Rice, Assistant United States Attorney, and Dana Mulhauser, Trial Attorney, Department of Justice, Civil Rights Division, and submits the following memorandum in aid of sentencing in this case.

                                               Respectfully submitted,

                                               JUSTIN E. HERDMAN
                                               United States Attorney

                    By:   /s/ Dana Mulhauser
                          Chelsea S. Rice (OH: 0076905)
                          Assistant United States Attorney
                          Dana Mulhauser (NY)
                          Trial Attorney, Department of Justice
                          United States Court House
                          801 West Superior Avenue, Suite 400
                          Cleveland, OH 44113
                          (216) 622-3752 / (202) 305-0007
                          (216) 522-7358 (facsimile)
                          Chelsea.Rice@usdoj.gov
                          Dana.Mulhauser.usdoj.gov

## SENTENCING MEMORANDUM

**I.  SUMMARY OF THE CASE**

On December 17, 2014, the Federal Bureau of Investigation and the Department of Homeland Security executed a set of search warrants at trailer parks in Marion, Ohio. The evidence gathered in that raid, along with other evidence, led to the exposure of a human trafficking and smuggling ring that compelled teenage migrants from Guatemala to work 12-hour days in difficult, often dangerous jobs on egg farms in central Ohio. The trafficking scheme included threats of violence and isolation in trailer parks with substandard living conditions, as well as removing minors from government custody for the purposes of trafficking them. The investigation and criminal charges that began with the December 2014 raid continued through 2015 and 2016.

The Defendant in this case, Pablo Duran Ramirez, was the direct supervisor of three defendants charged: Conrado Salgado Soto, Bartolo Dominguez, and the Defendant's own son, Pablo Duran Jr. The Defendant and his brother ran the company Haba Corporate Services, which served as the link between the traffickers and Trillium Egg Farm. In the two years when the trafficking scheme was at its height, 2013 and 2014, Trillium paid the Defendant's company $6 million.

As more details emerged about the trafficking scheme and more defendants were indicted, Duran Ramirez seemed to become aware of the illegal nature of his conduct. Sometime in 2015, he fled to Mexico without informing his family members. On May 25, 2016, while the Defendant was in Mexico, he was charged in a sealed indictment with being part of the labor trafficking conspiracy, as well as with a count of substantive labor trafficking and alien harboring. Dkt. No. 1.

On Christmas Eve of 2017, the Defendant attempted to reenter the country without going through an authorized port of entry. He was apprehended by Border Patrol after crossing the Rio Grande. At the time of his arrest, the Defendant told Border Patrol agents that he was aware of the warrant for his arrest and did not want to risk getting caught by entering at an authorized port of entry.

After the Defendant was taken into custody, the indictment was unsealed, on December 27, 2017. Dkt. No. 10 and Minutes of Arraignment (Unnumbered Dkt. Entry Dated Feb. 12, 2018). On September 17, 2018, the Defendant pleaded guilty to Count Three of the Indictment, encouraging illegal entry. In his guilty plea, the Defendant acknowledged that he knew that the individuals being smuggled were unaccompanied minors, and that he knew that they had been brought to the United States through coercion and threat.

### A. The Trafficking Conspiracy

The Defendant acknowledged in his plea agreement that he knew that the minors he smuggled were subject to coercion and threat—in other words, that they were trafficked. It is important to review the nature of that trafficking scheme in order to understand the Defendant's conduct.

The trafficking scheme was spearheaded by Aroldo Castillo-Serrano, a Guatemalan national who first came to the United States undocumented a decade ago and began arranging to smuggle other people across the border in 2008. He was removed from the United States in 2013 and continued running the smuggling and trafficking operation from Guatemala, where he recruited victims, collected money, and enforced payment via threats and coercive schemes. He admitted to smuggling about 35 people into the United States and connecting them with jobs when they got here.

3

Castillo-Serrano's associates in the United States included the Defendant in this case, as well as Bartolo Dominguez, Conrado Salgado-Soto, Pablo Duran Jr., Conrado Salgado Borbon, and Ana Angelica Pedro Juan. Those associates ran a scheme to employ the smuggled and trafficked workers at egg farms in Ohio. Duran Ramirez, the Defendant, ran the contracting company. Dominguez, Duran Jr., Salgado Soto, and Salgado Borbon worked as subcontractors under the Defendant, running crews of undocumented egg farm workers, arranging jobs for them, driving them to and from work, and distributing the worker's pay to the worker directly, or, in the case of the minors, to another member of the conspiracy. Dominguez, Salgado Borbon, and Duran Jr. were each charged with and pleaded guilty to harboring.

Other than the Defendant in this case, three defendants were charged as part of the trafficking conspiracy: Castillo-Serrano, Salgado Soto, and Pedro Juan. Each had a distinct role in the operation. Castillo-Serrano initiated, organized, and controlled the scheme. Pedro Juan ran the residential and financial aspects of the trafficking scheme in the United States, which included using false statements to obtain the minor victims from government custody. Salgado Soto obtained jobs for them and profited from their labor, with the knowledge that they were being coerced. Each of the three was charged with and pleaded guilty to the labor trafficking conspiracy. Of the six other people involved in the larger scheme, only Ana Angelica Pedro Juan is not known to have had significant contacts with the Defendant.

The heart of the trafficking scheme occurred between early 2013 and late 2014. Castillo-Serrano talked regularly on the phone with Duran Ramirez, the Defendant in this case, and with Salgado Soto. Salgado Soto and Duran Ramirez told Castillo-Serrano that they needed workers, and Castillo-Serrano agreed to supply them. Starting in mid-2014, those discussions included the

4

fact that minors were having an easier time getting across the border, and that they should therefore focus their activities on teenagers.

Castillo-Serrano then recruited candidates from his village and surrounding ones, largely by word of mouth. Castillo-Serrano made false promises to the minors, notably that they would be able to go to school while in the United States. If the individuals or their families had land to put up as collateral, Castillo-Serrano arranged for them to transfer that land to his mother, nephew, or brother-in-law. The typical debt was $15,000 per victim.

Castillo-Serrano made arrangements with a coyote to transport the victims to the United States. Seven of the minor victims were stopped at the border and placed in the custody of the Department of Health and Human Service's Office of Refugee Resettlement. In order for the minors to be released from government custody, they had to be placed in the custody of an approved relative or family friend. That person signed paperwork pledging to send the minors to school and protect them from abuse. The traffickers pretended to be family friends of the victims and take them into their custody. Those payments were added to the victims' debts.

When the minor victims were released to the traffickers, they arranged to have them brought directly to a trailer park controlled by the conspirators in Marion, Ohio. None of the minors was ever enrolled in school. The trailer park contained a set of abandoned trailers that the conspirators either owned or controlled. A number of the trailers had plumbing problems, heating problems, no beds, and pest infestations. The rent for the trailers, too, was added to the victims' debts. The victims, most of whom did not speak English and had no family in the United States, were not free to move out of the trailer park until they had paid their debts.

Castillo-Serrano set the victims up with jobs at the egg farm under the Defendant's network of subcontractors. The minors worked six or seven days a week, up to 12 hours a day.

The work included cleaning chicken coops, loading and unloading crates of chickens, de-beaking chickens, and vaccinating chickens. It was physically demanding and often unsafe. Many of the victims suffered respiratory problems and cuts and scratches. Though some complained, their complaints were ignored.

While some of the adults were paid directly, minors were not paid. Pedro Juan or others gave the minor victims $50 or $75 per week for food and necessities and sent the rest to Castillo-Serrano. The minor victims told the traffickers at various times that they didn't have enough to eat and needed more of their money either for themselves or their families. Each time, the traffickers refused.

The traffickers used a combination of threats, humiliation, deprivation, financial coercion, debt manipulation, and monitoring to compel compliance with their orders. Castillo-Serrano regularly threatened the victims if they complained about the work or the conditions. In one instance, after a minor victim complained about working and living conditions, Castillo-Serrano called the victim's father in Guatemala and told him that if the victim left, the father would be shot in the head. In retaliation for the same victim's complaints, Castillo-Serrano moved him to a trailer without heat or running water. In a second instance, Castillo-Serrano threatened to kill an adult victim and other workers if they refused to work at one of the farms. He also threatened to kill their families in Guatemala using his pistol and told the victim that he had people in Guatemala who could beat up others at his command. In a third instance, Castillo-Serrano threatened to kill a minor victim and his mother after the minor victim escaped from the traffickers' custody.

6

**B. Defendant's Knowledge**

The United States does not allege that the Defendant was aware of every single threat or deprivation suffered by the victims. But evidence does establish that the Defendant was aware of several of the victims' most crucial vulnerabilities and yet continued to profit from their exploitation.

The Defendant knew that there were migrant workers in his crews who were as young as 13. His son Marco Duran explained the following in a statement to a reporter:

> I remember when I was working there, my dad stopped by because he was one of the, you know, lead guys. And he stopped by and he pulled me aside. He's, like, "You need to look around." He's, like, "These young people, you know, younger than you, these people come from poor countries and they're working harder than most people that were born here with the citizenship and, you know, all those rights." My dad told me their ages and how they ranged from 13 to about 18.

Frontline: Trafficked in America, original air date April 24, 2018, transcript available at https://www.pbs.org/wgbh/frontline/film/trafficked-in-america/.

The Defendant also worked actively with the lead trafficker, Aroldo Castillo-Serrano, to recruit minors despite knowing that he was untrustworthy and dangerous. Evidence establishes that the Defendant spoke regularly on the phone with Castillo-Serrano for the purpose of bringing over workers, and that he told his subcontractors to contact Castillo-Serrano as well when they needed workers. Castillo-Serrano and the Defendant also discussed the fact that those workers would be minors. He did this despite describing Castillo-Serrano to other contractors as a "bad guy." The Defendant also toured the trailer parks where the minors were made to live and was therefore aware of the housing conditions and the isolation they were subjected to.

The Defendant's flight to Mexico and false exculpatory statements also show that he knew the wrongful nature of his conduct. Before going to Mexico, the Defendant told subcontractors that he could not be held criminally responsible because he never paid the

7

trafficked workers directly. He made similar statements publicly. See Frontline, cited supra. Statements like these show that the Defendant was willing to shift culpability to his employees—including his own son. He allowed four of his subcontractors to go to jail without accepting responsibility for his own conduct.

### C. Defendant's Profits

The Defendant's participation in the smuggling ring, as well as his admitted understanding that the minors he was smuggling were being coerced, resulted in remarkable personal profit. The Defendant had a 50 percent ownership stake in Haba Corporate Services. Accounting records show that, in 2013 and 2014, Haba earned $6,189,570 from Trillium Farms and paid out $2,850,488 to subcontractors, leaving $3,330,082 in the bank. While presumably some of that $3.3 million was paid out for bookkeeping, licensing, and other services, the fact remains that the Defendant's company was a low-overhead business, with no office space and no employees other than the Defendant and his brother, Ezequiel. In other words, a vast sum of the money earned by the Defendant from trafficked workers went straight into his pocket.

These profits have allowed the Defendant to purchase luxuries unimaginable to the victims in this case. In recorded jail calls, the Defendant talked to his wife about how they owned multiple properties in Mexico, including a farm to grow avocados and limes and several residences and motorcycles. He also discussed a friend or relative who owes him a debt of $200,000 and how the Defendant could begin collecting on that debt.

The Defendant disclosed only some of these assets to the Probation Office. He told them about the house and car he owned in the United States, and about the sale of one of the houses he owned in Mexico, but he did not disclose the existence of the other overseas properties or the $200,000 he is owed.

8

## II.   SENTENCING GUIDELINES CALCULATIONS

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable guidelines range under 18 U.S.C. § 3553(a)(4). A court may find facts by a preponderance of the evidence when calculating the appropriate guidelines range. United States v. Gates, 461 F.3d 703, 707-08 (6th Cir. 2006). Once a court has determined the appropriate sentencing range, it should then consider that range in light of the other relevant § 3553(a) factors. United States v. Thompson, 515 F.3d 556, 561 (6th Cir. 2008).

Both parties are limited by the plea agreement to arguing for the following as the correct computation of the applicable offense level:

| Guideline Section | Title | Offense level |
|---|---|---|
| 2L1.1(a)(3) | Base offense level | 12 |
| 2L1.1(b)(4) | Smuggling an unaccompanied minor | + 2 |
| 2L1.1(b)(8)(a) | Alien detained through coercion or threat | + 2 |
| 2L1.1(b)(9) | § 1324(a)(4) conviction | + 2 |
| 3A1.1(b)(2) | Large number of vulnerable victims | + 4 |
| | **Total Offense Level Before Acceptance of Responsibility** | **22** |

The plea agreement explicitly recognizes, however, that the Court is not bound by this recommendation and may calculate the Guidelines as it finds to be appropriate.

## III.   SECTION 3553(a) FACTORS

In light of the nature and circumstances of the offense, the history and characteristics of the Defendant, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities, the Government respectfully recommends that a sentence within the Guidelines is sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

9

### A. Nature and Circumstances of the Offense

The Defendant was a leader in a criminal enterprise that exploited unaccompanied minors in order to make money. As such, he is more culpable than someone who was merely following orders. See United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995) (noting the importance of increasing the punishment of those who exercised more responsibility for the operation of a criminal enterprise). While the Defendant may not have known the full nature of the conduct of other participants, he knew that he was entrusting extremely vulnerable young adults into the hands of a "bad man" and saddling them with a dangerous journey and heavy debt.

Further, by heading the chain of subcontractors, the Defendant accrued significant financial benefit from his conduct. While the victims received $50 to $75 a week, which often left them hungry and living in overcrowded, substandard conditions, the Defendant and his brother accrued more than $2 million in assets, which he used to acquire multiple homes, properties, and vehicles.

### B. History and Characteristics of the Defendant

The most notable characteristic of the Defendant, for purposes of this sentencing, is his desire to evade responsibility for the first several years of this investigation. While it is true that the Defendant has, at this point, taken responsibility for his conduct, he spent two years after the initial raid telling his subordinates that he was not responsible—and that they were—because he never physically interacted with the workers or paid them directly. By hiring others as intermediaries between himself and the minor victims, the Defendant attempted to insulate himself from responsibility and leave it to fall on his underlings.

10

The Defendant's flight to Mexico showed similar characteristics. That flight allowed the Defendant to retain his assets while the earlier-charged defendants were forced to pay restitution. According to the Probation Office, the restitution in this case has been fully paid by the Defendant's subordinates. It was only after all other Defendants were sentenced and restitution was paid that the Defendant returned to face the charges against him. Thus, the Defendant will— as a result of his flight—retain the money he earned from trafficked workers while his subcontractors were forced to disgorge theirs. Such conduct should be taken into account not only in the determination of the Defendant's sentence of incarceration, but also of whether the Defendant should be ordered to pay a fine.

> C. **Need of the Sentence to Reflect the Serious of the Offense, to Promote Respect for the Law, and to Provide Just Punishment**

Imposing a sentence within the range suggested by the Guidelines would reflect the seriousness of the Defendant's offense, promote respect for the law, and provide just punishment. Only a significant sentence will promote proper respect for the law and provide just punishment to the Defendant.

> D. **The Need of the Sentence Imposed to Afford Adequate Deterrence and Protect the Public from further crimes of the Defendant**

There is also a need for the Defendant's sentence to deter others from unlawfully bringing aliens into the United States. United States v. Flores-Machicote, 706 F.3d 16, 22 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus."); United States v. Miller, 484 F.3d 964, 967-68 (8th Cir. 2007) ("general deterrence . . . is one of the key purposes of sentencing . . . ."); United States v. Jackson, 835 F.2d 1195, 1199 (7th Cir. 1987) (Posner, J., concurring) ("deterrence is the surest ground for punishment . . . since incapacitation may, by removing one offender from the pool of offenders, simply make a career

11

in crime more attractive to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime 'market.'").

As this case has shown, alien harboring can be financially rewarding, especially for employers who intentionally exploit vulnerable victims. There is, accordingly, a need to deter other potential employers who are contemplating similar conduct. Because the financial rewards of such crimes can be great, and the risk of being discovered and punished are easily minimized, the sentences of those who are successfully prosecuted must be substantial. See United States v. Hauptman, 111 F.3d 48, 52 (7th Cir. 1997) (strong sentences are necessary to deter crimes that are potentially lucrative). Only a strong sentence will negate the incentive to commit such crimes and the danger that similar crimes will go undiscovered and unpunished.

### E. The Need to Avoid Unwarranted Sentencing Disparities

Finally, this Court must also fashion a sentence that avoids unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). In this case, the best way to avoid unwarranted sentencing disparities is to sentence the Defendant within the range suggested by the Guidelines. By "devising a recommended sentencing range for every type of misconduct and every level of criminal history, the Guidelines as a whole embrace the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." United States v. Johnson, 445 F.3d 339, 343 (4th Cir. 2006); see United States v. Clark, 434 F.3d 684, 687 (4th Cir. 2006) (noting that the Guidelines were designed to avoid unwarranted disparities that existed in the federal criminal justice system). The Guidelines calculations in the Defendant's plea reflect that this is no ordinary harboring conviction. The enhancements added under the Guidelines reflect the serious nature of the Defendant's conduct and the high risk it placed on the vulnerable people who were smuggled.

## IV. RESTITUTION AND FINES

As noted above, restitution has already been paid in this matter. Assuming that no new claims of restitution are presented by the date of sentencing, the United States believes that a significant fine would be appropriate in order to prohibit the Defendant from benefitting financially from his conduct.

The maximum fine permissible by statute for this crime is generally $250,000, 18 U.S.C. § 3571(b), though the statute also contains an additional provision allowing for additional fines of up to double a defendant's "pecuniary gain from the offense." 18 U.S.C. § 3571(d). The Sentencing Guidelines allow for a fine of up to $100,000 for a defendant whose Guideline level is a 19 (the Guideline level recommended in the plea agreement) or $150,000 for a defendant whose Guideline level is a 22 (the Guideline level recommended here by probation). USSG § 5E1.2(c)(3). The Court may order a defendant to pay a fine in installments rather than immediately, as the interests of justice require. 18 U.S.C. § 3572(d).

When considering whether to impose a fine, the Court should consider, in addition to the factors set forth in Section 3553(a):

> (1) the defendant's income, earning capacity, and financial resources;
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
> (3) any pecuniary loss inflicted upon others as a result of the offense;
> (4) whether restitution is ordered or made and the amount of such restitution;
> (5) the need to deprive the defendant of illegally obtained gains from the offense;
> (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; [and]
> (7) whether the defendant can pass on to consumers or other persons the expense of the fine.

18 U.S.C. § 3572(a). Further considerations are listed at USSG § 5E1.2.

Although the Defendant claimed to Probation not to have assets, the recordings of his jail calls show otherwise. Those calls show that the Defendant has multiple properties and significant unclaimed loans to others. In addition, the Defendant has a strong ability to earn more money once he is released from jail, which is one of the factors listed at USSG § 5E1.2. As John Glessner testified at the Defendant's detention hearing, the Defendant has a job waiting for him with housing and a "competitive" compensation package. Accordingly, a fine is warranted here and should be imposed.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court sentence the Defendant within the Guidelines ranges set forth above and order him to pay a fine.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:  /s/ Chelsea S. Rice
Chelsea S. Rice (OH: 0076905)
Assistant United States Attorney
Dana Mulhauser (NY)
Trial Attorney, Department of Justice
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3752 / (202) 305-0007
(216) 522-7358 (facsimile)
Chelsea.Rice@usdoj.gov
Dana.Mulhauser.usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on this 28th day of December, 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

        /s/ Dana Mulhauser
        Dana Mulhauser
        Trial Attorney